**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

MICHAEL WOOD,                )
                                       )
        Plaintiff,          )
                                       )      Civil Action No. 20-cv-02369
        v.                   )
                                       )      Honorable Charles R. Norgle
SECURITY CREDIT SERVICES, LLC,   )
d/b/a EQUIPRO INVESTMENTS,      )
                                       )
        Defendant.        )

### SECOND AMENDED COMPLAINT—CLASS ACTION

Plaintiff Michael Wood brings this action under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* ("FDCPA") and alleges:

### JURISDICTION AND VENUE

1.    This Court has jurisdiction pursuant to § 1692k(d) of the FDCPA, and 28 U.S.C. § 1331.

2.    Venue is proper in this District because parts of the acts and transactions occurred here and Defendant transacts substantial business here.

### STANDING

3.    Plaintiff has suffered an injury in fact that is traceable to Defendant's conduct and that is likely to be redressed by a favorable decision in this matter.

4.    Specifically, Plaintiff suffered a concrete injury and harm to his reputation as a result of Defendant's sharing of false information regarding an alleged debt, with a third party.

5.    Plaintiff has thus suffered an injury as a result of Defendant's conduct, and suffered harm to his reputation, giving rise to standing before this Court. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1544 (2016), quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 580 (1992)

1

(Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before.); *Bellwood v. Dwivedi*, 895 F. 2d 1521, 1526-27 (7th Cir. 1990) ("Congress can create new substantive rights, such as a right to be free from misrepresentations, and if that right is invaded the holder of the right can sue without running afoul of Article III, even if he incurs no other injury[.]").

## PARTIES

6. Plaintiff, Michael Wood ("Plaintiff"), is a resident of the State of Illinois, from whom Defendant attempted to collect an alleged debt originated as a Pentagon Federal consumer credit card account. Plaintiff is thus a "consumer" as that term is defined in 15 U.S.C. §1692a(3) of the FDCPA.

7. Defendant Security Credit Services, LLC d/b/a Equipro Investments ("SCS" or "Defendant") is an Ohio corporation that does or transacts business in Illinois. Its registered agent is Illinois Corporation Service C, 801 Adlai Stevenson Drive, Springfield, Illinois, 62703.

8. Defendant SCS is engaged in the business of a collection agency, using the mails and telephone to collect defaulted consumer debts originally owed to others.

9. SCS holds a collection agency license from the State of Illinois.

10. SCS maintains a website, https://equiproinvestments.com/services/, which reads in part as follows:

> Receivables Acquisitions
>
> EquiPro Investments, also known as Security Credit Services, is a trusted receivables purchasing company. Over the past 13 years, we have purchased more than $10B of delinquent and charged-off receivables and partnered with more than 100 creditors originating a variety of credit types ranging from credit cards, to bank loans, to specialty finance accounts and everything in between. Through data mining, analytics and data-driven business decisions, we manage the entire process for purchasing and managing portfolios. We respect the brand of the companies as we manage their receivables.

2

(https://equiproinvestments.com/services/, Accessed 16 Apr. 2020)

11.     On a monthly basis, SCS communicates credit information on thousands of accounts that it owns, to the Equifax, Experian and/or TransUnion credit reporting agencies.

12.     On a monthly basis, SCS communicates credit information on thousands of consumer accounts to the Equifax, Experian and/or TransUnion credit reporting agencies in an attempt to collect debts on its behalf.

13.     SCS' principal business purpose is the collection of defaulted consumer debts via interstate commerce and/or the mails, and it is a "debt collector" as defined in 15 U.S.C. § 1692a(6) of the FDCPA.

## FACTUAL ALLEGATIONS

14.     Plaintiff incurred an alleged debt for purchases of goods and services used for personal, family and household purposes ("Alleged Debt"), originally for a Pentagon Federal ("PenFed") credit card account ("Account").

15.     Plaintiff used the credit card to make purchases for personal or household purposes, such as for the purchase of groceries for family use.

16.     The Alleged Debt is thus a "debt" as that term is defined at § 1692a(5) of the FDCPA.

17.     The Alleged Debt went into default.

18.     The original creditor began credit reporting the Alleged Debt and Plaintiff saw that the reported amount was inflated.

19.     Plaintiff disputed the amount of alleged indebtedness directly with PenFed.

20.     On or about February 18, 2018 Pentagon Federal communicated the fact of Plaintiff's dispute to the Experian credit bureau. (Exhibit A, Redacted Excerpt of Plaintiff's Experian credit report).

21.     The Alleged Debt was thereafter reported as being disputed on Plaintiff's Experian credit report.

22.     SCS thereafter purported to have acquired the Alleged Debt after default, and began collecting it by causing its own tradeline to be reported on Plaintiff's Equifax credit report. (Exhibit B, Redacted Excerpt from Plaintiff's Equifax Report).

23.     According to PenFed, on or about July 30, 2018, it sold a pool of charged-off accounts, including the Account, to SCS pursuant to a written purchase agreement dated July 25, 2018 titled the "Account Purchase Agreement".

24.     Upon information and belief, PenFed provided SCS a collection file when SCS alleged to have acquired the Alleged Debt, which included data such as Plaintiff's contact information and a balance.

25.     By operation of its own agreement with PenFed, however, SCS was not informed of the fact of the dispute of the Alleged Debt through the placement file transferred by PenFed because SCS' agreement with PenFed omitted any requirement that the "dispute" status of the purchased debts—whether they were disputed or not—be communicated.

26.     In fact, the reason that the dispute was not communicated by PenFed to SCS was because SCS entered into an agreement with PenFed that would not require PenFed to advise SCS of disputes previously made on the accounts that it alleged to have purchased.

27.     SCS, at no time prior to the filing of the original complaint in this case, asked or inquired of PenFed whether the Alleged Debt was disputed, or not.

28.     SCS, at no time prior to the filing of the original complaint in this case, asked or inquired of PenFed whether any of the debts contained within the pool of debts that contained Plaintiff's Alleged Debt, were disputed.

29.     Plaintiff's dispute made in connection with the Account was "resolved' by PenFed, in that PenFed deemed the dispute to be without merit.  (Exhibit C, May 16, 2017 Letter from PenFed).

30.     But the fact that PenFed deemed the dispute to be without merit does not obviate the need for SCS to communicate the disputed status of the Alleged Debt to Equifax when it communicated other credit information relating to the Alleged Debt to Equifax.

31.     SCS, by taking over Plaintiff's Alleged Debt, stepped into the shoes of their predecessor-in-interest, "whatever the shoe size". See *Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285, 289 (7th Cir. 2005). Accordingly, they take both the part of the account that allowed for collection (name, address, contract, account balance and history), along with the part of the account that limits how it could be reported to a credit reporting agency (disputed status) – namely, that the Alleged Debt, if reported to a credit reporting agency, must be reported as being disputed.

32.     In fact, when SCS alleged to have purchased Plaintiff's defaulted debt, via a large portfolio of thousands of defaulted consumer debts originally owed to PenFed, it was well aware that the accounts it had obtained contained, or likely contained, debts that were disputed since SCS agreed to purchase "disputed" accounts as long as the disputes were already "resolved" by PenFed.

33.     Specifically, Plaintiff's dispute with PenFed was "resolved" by Penfed as being found to be without merit, and was sold to SCS without any indication in the sales file that the Alleged Debt was ever disputed.

34.     However, even a "resolved" dispute imposes a requirement that a debt, if reported on a consumer's credit, be communicated as being disputed—irrespective of whether a furnisher finds merit in the dispute.

35.     In fact, the 7th Circuit has unambiguously held that "Section 1692e(8) does not require an individual's dispute be valid or even reasonable. Instead, the plaintiff must simply make clear that he or she disputes the debt." *See DeKoven v. Plaza Assocs.*, 599 F.3d 578, 582 (7th Cir. 2010) ("[A] consumer can dispute a debt for 'no reason at all ....'"); *Evans v. Portfolio Recovery Assocs., LLC*, 889 F.3d 337, 346-347 (7th Cir. 2018) (same).

36.     Indeed, the FDCPA, Section 1692e(8),  does not require an individual's dispute be valid.

37.     SCS substituted its own tradeline for that of PenFed's sometime in 2018. (Exhibit B, Redacted Excerpt from Plaintiff's Equifax Report).

38.     SCS thereafter communicated credit information regarding the Alleged Debt to Equifax.

39.     SCS failed, however, to communicate the fact of Plaintiff's dispute when it communicated other information to Equifax regarding the Alleged Debt.

40.     For the accounts alleged to have been sold as part of the pool of debts that included the Alleged Debt, the agreement relating to the alleged sale of the Alleged Debt to SCS—the "Account Purchase Agreement"— did not require PenFed to inform SCS of any dispute made in connection with said accounts.

41.     The Account Purchase Agreement also provided that no accounts with "unresolved disputes" would be sold as part of the pool of accounts sold to SCS by PenFed.

42.     SCS did not require PenFed to communicate the existence of a dispute made on an account when the dispute was "resolved" by PenFed, as it was in this case.

43.     SCS agreed to purchase disputed accounts (such as Plaintiff's) as well as those not previously disputed; SCS was thus aware that it was purchasing accounts from PenFed that were subject to disputes, and it was thus aware that said disputed accounts would be sold to SCS without any indication, in the electronic sale file, as to whether the accounts were disputed, or not. (Exhibit D, Plaintiff's Electronic Sale File).

44.     SCS did not require PenFed to communicate the existence of a dispute made on any accounts contained within the pool of accounts sold by PenFed to SCS, that contained Plaintiff's Alleged Debt.

45.     SCS did not request that PenFed provide information regarding whether any of the Alleged Debts sold to SCS, by PenFed, were previously disputed by the account holders.

46.     SCS also did not require PenFed to inform it of any dispute made ***on any of the accounts*** it alleged to have purchased from PenFed where PenFed determined the dispute was without merit.

47.     SCS' agreement with PenFed provided that accounts with pre-existing disputes that were resolved as being without merit by PenFed were included in the pool of accounts purchased, but were sold without any notation that the accounts were disputed because they were already "resolved" by PenFed.

48. Plaintiff's account was an account wherein Plaintiff disputed the Alleged Debt with PenFed, but PenFed deemed it to be a dispute without merit. (Exhibit C, May 16, 2017 Letter from PenFed).

49. SCS was thus aware that it was purchasing accounts from PenFed that were subject to disputes, but that those disputes were deemed to be without merit, and it was thus aware that said accounts would be sold to SCS without any indication as to whether the accounts were disputed.

50. SCS thus purchased a pool of debts from PenFed that it intended to cause to be credit reported, without requiring that PenFed inform it of *material* information, specifically whether any of said debts were disputed, thus guaranteeing that it would violate the FDCPA when it began credit reporting the alleged debts to Equifax for any debt that was subject to a dispute.

51. By purchasing a pool of debts from PenFed without requiring PenFed to communicate whether or not the debts were disputed, which is material information relating to the debts, SCS ensured that it would be violating the FDCPA as to numerous debts that were previously disputed, that it would credit report as not being disputed.

52. SCS thus should have known that the Account was disputed, as the information was known and available to PenFed when the account was sold, and thus SCS should have required this information to be provided by PenFed so that SCS could comport with its statutory duty to communicate disputes on debts that it causes to be credit reported, since it knew it would be credit reporting the Account, though it could not comply with the FDCPA, section 1692e(8), without having information as to whether the Account was disputed.

53.     SCS' procedures and policies for determining whether a debt is disputed amounts to little more than acting like an ostrich with its head in the sand, as it assured that the debts it purchased had no information, in the data that was transferred in connection with the sale of the debts, as to whether they had been subject to a previous dispute.

54.     SCS was aware that, for accounts that were disputed but where the disputes were "resolved" by PenFed as being without merit, SCS would not be given notice that the accounts were disputed in the first place, though SCS intended to cause said accounts to be credit reported at all times.

55.     Whether or not a consumer is disputing a debt is no minor matter that could be deemed an immaterial aspect of the debt. Such a false and misleading statement [sic] would likely influence a consumer's decision to pay a debt ... [and] could have had far reaching consequences for [plaintiff] in her daily life. *Evans v. Portfolio Recovery Assocs., LLC*, 889 F.3d 337, 349 (7th Cir. 2018).

56.     SCS intended to cause the majority of the debts it purchased from PenFed, in the pool of debts that contained Plaintiff's Alleged Debt, to be credit-reported.

57.     SCS thus purchased a pool of debts from PenFed without requiring that PenFed inform it of material information, specifically whether any of said debts were disputed, thus guaranteeing that it would violate the FDCPA when it began credit reporting the alleged debts to Equifax for any debt that was subject to a dispute.

58.     SCS' own actions in entering into an agreement with PenFed, that did not require PenFed to inform SCS of material information regarding the alleged debts, was calculated to avoid SCS from having to comply with the FDCPA, section 1692e(8), and ensured that it would violate the FDCPA when it began to credit report the alleged debts it alleges to have purchased.

59.     SCS thus should have known that the Account was disputed, had it not entered into a purchase agreement with PenFed that assured that it would not be informed of any previous disputes as to any of the alleged debts it purchased from PenFed, including that of Plaintiff.

60.     By failing to treat accounts having "resolved" disputes as being disputed accounts *nonetheless* for the purposes of credit reporting under section 1692e(8) of the FDCPA, SCS effectively contracted with PenFed to violate the FDCPA, section 1692e(8), with respect to the accounts it alleged to have purchased that SCS would later credit report to Equifax.

61.     SCS thus knew or should have known of Plaintiff's dispute when it communicated information regarding the Alleged Debt to Equifax.

62.     If SCS did not know of Plaintiff's dispute, it is only because of its own actions in purchasing a pool of debts—thousands of accounts—from PenFed that had no information as to whether any of the alleged debts were disputed, because SCS contracted with PenFed to not receive said information.

63.     SCS had access to Plaintiff's credit reports at all times after it alleges to have purchased the Alleged Debt.

64.     15 U.S.C. § 1692e of the FDCPA provides as follows:

**False or misleading representations**

**A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:**

**. . . (8) Communicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed. . . .**

65.     SCS failed to communicate a dispute to the Equifax credit reporting agency, in violation of 15 U.S.C. § 1692e(8), when it knew or should have known about the dispute and communicated other information regarding the Alleged Debt to Equifax.

66.     SCS reports derogatory tradelines on a monthly basis via the Equifax credit reporting agency on thousands of accounts that it purports to own.

67.     Credit reporting by a debt collector constitutes an attempt to collect a debt. *Rivera v. Bank One*, 145 F.R.D. 614, 623 (D.P.R. 1993) (a creditor's report of a debt to a consumer reporting agency is a "powerful tool, designed in part to wrench compliance with payment terms from its cardholder").

68.     SCS materially lowered Plaintiff's credit score by failing to communicate Plaintiff's dispute to Equifax, and diminished his ability not obtain credit.

69.     A debt reported with no dispute results in a much lower credit score than a report of both the debt and the dispute. *Saunders v. Branch Banking and Trust Co. of VA*, 526 F. 3d 142, 146-47 (4th Cir. 2008).

70.     At the time of the alleged violations, Plaintiff was experiencing some personal financial problems, but wished to buy a home for his growing family, and was advised by a mortgage broker that he needed to review and understand his credit history and to make sure it was accurate.

71.     It was at that time he noticed the PenFed/SCS inaccuracy. Plaintiff spent time and money to correct the false information reported to his credit, retaining the services of an attorney who disputed the debt on his behalf.

72.     Plaintiff was encouraged when PenFed properly processed his dispute and noted his account as disputed, as his broker had explained that a marked dispute communicates to

11

potential lenders that there is disagreement over the tradeline and it thus has less of an impact on lending decisions.

73.     When SCS removed the dispute and/or failed to communicate the fact that the Alleged Debt was disputed by Plaintiff to the Equifax credit reporting agency, Plaintiff was discouraged because of all the time and expense he had gone through to get PenFed to properly update the account. He did not feel it was worth it to go through that time and expense again if each subsequent collector can simply wipe it away by replacing the tradeline that had a dispute notation.

74.     Plaintiff did not apply for credit he would have otherwise applied for had the dispute been properly noted.

75.     Plaintiff lost sleep due to SCS' actions due to his worry about the effect that the false information had on his credit score and ability to obtain credit, specifically when he became aware that SCS was credit reporting the Alleged Debt without also having communicated that the Alleged Debt was subject to a dispute.

76.     As a result, Plaintiff stopped trying to fix the problem and temporarily suspended efforts to buy a home for his family, and to obtain credit.

77.     SCS' collection actions caused Plaintiff to experience negative emotions, including frustration, annoyance, agitation, and other garden variety emotional distress.

78.     SCS' collection actions caused Plaintiff to have a lower credit score and less credit-worthiness than he would have had if the dispute was noted on the Account tradeline.

79.     As a result, Plaintiff stopped trying to fix the problem and temporarily suspended efforts to buy a home for his family.

80. SCS' collection actions caused Plaintiff to experience negative emotions, including frustration, annoyance, agitation, and other garden variety emotional distress.

81. SCS' collection actions caused Plaintiff to have a lower credit score and less credit-worthiness than he would have had if the dispute was noted on the Account tradeline.

82. SCS is no stranger to using false, deceptive, and/or misleading representations or means in connection with the collection of any debt, as it was recently sued by the Federal Trade Commission for violating the FDCPA and entered into a stipulated judgment in connection with the same. (Exhibit E, FTC Complaint and Judgment).

83. When SCS bought the alleged debts contained within the same portfolio that contained the Alleged Debt, whether any given alleged debt contained within the portfolio was previously disputed by a consumer was information readily available to SCS.

84. SCS' collection communications are to be interpreted under the "unsophisticated consumer" standard. *Gammon v. GC Services, Ltd. Partnership*, 27 F.3d 1254, 1257 (7th Cir. 1994).

## CLASS ALLEGATIONS

85. Plaintiff re-alleges the paragraphs above as if set forth fully in this count.

86. Plaintiff, Michael Wood, brings this action individually and as a class on behalf of the following class:

(1) All persons residing in the State of Illinois (2) from whom Defendant attempted to collect a debt that originated with PenFed (3) by communicating credit information relating to a previously disputed debt (4) to the Equifax credit reporting agency for the purpose of credit reporting the debt via a tradeline (5) without also communicating the fact that the debt had been disputed (6) during the period of time that begins one year

prior to the filing of Plaintiff's original Complaint [1], and ends on the date the original Complaint was filed.

87.     Defendant has purchased over 14,000 accounts from PenFed since July 2018.

88.     Defendant causes most of the accounts it purchases to be credit-reported via the Equifax, Experian, and/or TransUnion credit reporting agencies.

89.     Therefore, the class likely consists of more than 40 persons from whom Defendant attempted to collect a defaulted disputed consumer debt by causing it to be credit reported, without also communicating the fact that said debt was disputed by the consumer from which it was being collected, in violation of section 1692e(8) of the FDCPA.

90.     Based on the fact that debts are assigned to collection agencies in groups of debts of similar type and vintage and not individually, the class is so numerous that joinder of all members is impracticable.

91.     Plaintiff 's claims are typical of the claims of the Class. Common questions of law or fact raised by this class action complaint affect all members of the Class and predominate over any individual issues. Common relief is therefore sought on behalf of all members of the Class. This class action is superior to other available methods for the fair and efficient adjudication of this controversy.

92.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class and would, as a practical matter, either be dispositive of the interests of other members of the Class not party to the adjudication, or substantially impair or impede their ability to protect their interests.

93.     Plaintiff will fairly and adequately protect and represent the interests of the Class. The management of the class action proposed is not extraordinarily difficult, and the factual and legal issues raised by this class action complaint will not require extended contact with the members of the Class, because Defendant's conduct was perpetrated on all members of the Class and will be established by common proof.

94.     Plaintiff has retained counsel that has been approved as class counsel in prior class actions, including class actions brought under the FDCPA.

## COUNT I—FAIR DEBT COLLECTION PRACTICES ACT

95.     Plaintiff re-alleges the above paragraph as if set forth fully in this count.

96.     SCS failed to communicate a dispute to the Equifax credit reporting agency, in violation of 15 U.S.C. § 1692e(8), when it knew or should have known about the dispute and when it communicated other information regarding the Alleged Debt to the Equifax credit reporting agency.

WHEREFORE, Plaintiff asks that the Court enter judgment in favor of himself and against Defendant as follows:

A.     Actual damages pursuant to 15 U.S.C. § 1692k(a)(1);

B.     Statutory damages pursuant to 15 U.S.C. § 1692k(a)(2);

C.     Costs and reasonable attorney fees pursuant to 15 U.S.C. 1692k(a)(3); and

D.     Such other or further relief as the Court deems proper.

By: /s/*Mario Kris Kasalo*
One of Plaintiff's Attorneys

15

Mario Kris Kasalo
**The Law Office of M. Kris Kasalo, Ltd.**
4950 Madison Street
PO Box 1425
Chicago, Illinois 60077
Ph: 312-726-6160
Fx: 312-698-5054
Mario.kasalo@kasalolaw.com

# EXHIBIT A



**Account name**
PENTAGON FEDERAL CR UN

PO BOX 1432
ALEXANDRIA, VA 22313
703 838 1000
**Address identification number**
0126659501

**Account number**
430679302031....

**Type**
Credit card
**Terms**
NA

**On record until**
Nov 2020

**Recent balance**
$15,325 as of
02/18/2018

**Credit limit or origi-nal amount**
$13,500
**High balance**
$15,325
**Monthly payment**
$0
**Recent payment amount**
$0

**Date opened**
08/2011

**Date of status**
08/2014
**First reported**
08/2011

**Responsibility**
Individual

**Status**
<span style="color:red">**Account charged off. $15,325 written off. $15,325 past due as of Feb 2018.**</span>
**Reinvestigation information**
This item was updated from our pro-cessing of your dispute in May 2017.

**Account history**

| 2018 | | 2017 | | | | | | | | | | | 2016 | | | | | | | | | | | | Jan |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Feb | Jan | Dec | Nov | Oct | Sep | Aug | Jul | Jun | May | Apr | Mar | Feb | Jan | Dec | Nov | Oct | Sep | Aug | Jul | Jun | May | Apr | Mar | Feb | Jan |
| CO | CO | CO | CO | CO | CO | CO | CO | CO | CO | CO | CO | CO | CO | CO | CO | CO | CO | CO | CO | CO | CO | CO | CO | CO | CO |

| 2015 | | | | | | | | | | | | 2014 | | | | | | | | | | | 2013 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dec | Nov | Oct | Sep | Aug | Jul | Jun | May | Apr | Mar | Feb | Jan | Dec | Nov | Oct | Sep | Aug | Jul | Jun | May | Apr | Mar | Feb | Jan | Dec | Nov |
| CO | CO | CO | CO | CO | CO | CO | CO | CO | CO | CO | CO | CO | CO | CO | CO | 180 | 150 | 120 | 90 | 60 | 30 | OK | OK | OK | OK |

Aug
OK

Charge Off as of Aug 2014 to Feb 2018
180 days past due as of Jul 2014
150 days past due as of Jun 2014
120 days past due as of May 2014
90 days past due as of Apr 2014
60 days past due as of Mar 2014
30 days past due as of Feb 2014

**Balance history**

The following data will appear in the following format:
Date: account balance / date payment received / scheduled payment amount / actual amount paid
Jan 2018: $15,325 / Dec 13, 2013 / No data / No data
Dec 2017: $15,325 / Dec 13, 2013 / No data / No data
Nov 2017: $15,325 / Dec 13, 2013 / No data / No data
Oct 2017: $15,325 / Dec 13, 2013 / No data / No data
Sep 2017: $15,325 / Dec 13, 2013 / No data / No data
Aug 2017: $15,325 / Dec 13, 2013 / No data / No data
Jul 2017: $15,325 / Dec 13, 2013 / No data / No data
May 2017: $15,325 / Dec 13, 2013 / No data / No data
Apr 2017: $15,325 / Dec 13, 2013 / No data / No data
Apr 2017: $15,325 / Dec 13, 2013 / No data / No data
Feb 2017: $15,325 / Dec 13, 2013 / No data / No data
Jan 2017: $15,325 / Dec 13, 2013 / No data / No data
Dec 2016: $15,325 / Dec 13, 2013 / No data / No data
Nov 2016: $15,325 / Dec 13, 2013 / No data / No data
Oct 2016: $15,325 / Dec 13, 2013 / No data / No data
Sep 2016: $15,325 / Dec 13, 2013 / No data / No data
Aug 2016: $15,325 / Dec 13, 2013 / No data / No data
Jul 2016: $15,325 / Dec 13, 2013 / No data / No data
Jun 2016: $15,325 / Dec 13, 2013 / No data / No data
May 2016: $15,325 / Dec 13, 2013 / No data / No data
Apr 2016: $15,325 / Dec 13, 2013 / No data / No data
Mar 2016: $15,325 / Dec 13, 2013 / No data / No data
Between Mar 2016 and Jan 2018, your credit limit/high balance was $13,500

# EXHIBIT B



# CREDIT REPORT

---

**MICHAEL WOOD**

**Report Confirmation**

**0604999296**

## 5.2 SECURITY CREDIT SERVICES (CLOSED)

### Summary

Your debt-to-credit ratio represents the amount of credit you're using and generally makes up a percentage of your credit score. It's calculated by dividing an account's reported balance by its credit limit.

| Account Number | | Reported Balance | $15,325 |
|---|---|---|---|
| Account Status | COLLECTION | Debt-to-Credit Ratio | 100% |
| Available Credit | | | |

### Account History

The tables below show up to 2 years of the monthly balance, available credit, scheduled payment, date of last payment, high credit, credit limit, amount past due, activity designator, and comments.

#### Balance

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2018 | | | | | | | | | | | | |
| 2019 | | | | | | | | | | | | |
| 2020 | | | | | | | | | | | | |

#### Available Credit

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2018 | | | | | | | | | | | | |
| 2019 | | | | | | | | | | | | |
| 2020 | | | | | | | | | | | | |

#### Scheduled Payment

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2018 | | | | | | | | | | | | |
| 2019 | | | | | | | | | | | | |
| 2020 | | | | | | | | | | | | |

#### Actual Payment

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

2018

2019

2020

## High Credit

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 2018 | | | | | | | | | | | | |
| 2019 | | | | | | | | | | | | |
| 2020 | | | | | | | | | | | | |

## Credit Limit

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 2018 | | | | | | | | | | | | |
| 2019 | | | | | | | | | | | | |
| 2020 | | | | | | | | | | | | |

## Amount Past Due

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 2018 | | | | | | | | | | | | |
| 2019 | | | | | | | | | | | | |
| 2020 | | | | | | | | | | | | |

## Activity Designator

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 2018 | | | | | | | | | | | | |
| 2019 | | | | | | | | | | | | |
| 2020 | | | | | | | | | | | | |

# Payment History

You currently do not have any Payment History in your file.

# Account Details

View detailed information about this account. Contact the creditor or lender if you have any questions about it.

| | | | |
|---|---|---|---|
| High Credit | $15,325 | Owner | INDIVIDUAL |
| Credit Limit | | Account Type | OTHER |
| Terms Frequency | UNKNOWN | Term Duration | 0 |
| Balance | $15,325 | Date Opened | Aug 01, 2018 |
| Amount Past Due | $15,325 | Date Reported | Mar 20, 2020 |
| Actual Payment Amount | | Date of Last Payment | |
| Date of Last Activity | | Scheduled Payment Amount | |
| Months Reviewed | 18 | Delinquency First Reported | Sep 01, 2018 |
| Activity Designator | | Creditor Classification | BANKING |
| Deferred Payment Start Date | | Charge Off Amount | |
| Balloon Payment Date | | Balloon Payment Amount | |
| Loan Type | Debt Buyer Account | Date Closed | |
| Date of First Delinquency | Jan 01, 2014 | | |

## Comments

Collection account

## Contact

SECURITY CREDIT SERVICES
2653 WEST OXFORD LOOP
STE 108
OXFORD, MS  38655
1-866-699-7889

**EXHIBIT C**

EXHIBIT C

# CREDIT LAW CENTER
## *Notice new address*

4041 NE Lakewood Way Ste 140
Lee's Summit, MO 64064
Phone (816) 994-4600 Fax (855) 523-5900

April 26, 2017

Pentagon Federal Credit Union
Po Box 1432
Alexandria, VA 22313-2032

Client Name:  Michael Wood
Account(s) to be validated: 43067930****
SSN: ███-0043
DOB: ███ 976
Address:  207 E Ohio St Apt 389

To Whom It May Concern:

My law firm has been retained to represent  Michael Wood in regard to the above listed account. This letter is being sent to you in response to a listing on my client's credit report. Be advised that this is not a refusal to pay, but a notice sent pursuant to the Fair Credit Reporting Act (FCRA) 15 U.S.C. § 1681.

This letter is sent in accordance with our representation so that we can rectify this situation amicably before any further actions are required by either party.  We are requesting that you review your current reporting practices affecting my client.  My client requests that the negative discrepancies on their report be deleted immediately.  As they may not be purposeful, removing them at this time will obviate any need for further action by my office.

Please note that, for the purposes of 15 USC 1692 et seq., this Notice has the same effect as a dispute to the validity of the alleged debt and a dispute to the validity of your claims. This Notice is an attempt to correct your records, and any information received from you will be collected as evidence should further action be necessary. This is a request for information only, and is not a statement, election, or waiver of status. Please contact my office with any questions or concerns.

Respectfully,

Thomas A. Addleman

Attorney at Law

TA/kj
cc: Michael Wood

DocuSign Envelope ID: 1E3D9F9F-59E3-4E75-BC77-E4D54A402610

# POWER OF ATTORNEY

### I.  PRINCIPAL AND ATTORNEY-IN-FACT

I hereby appoint the following person to serve as my attorney-in-fact, to act for me in any lawful way with respect to the subjects indicated below.

Name:  Credit Law Center
Address:  255 NW Blue Parkway, Suite 200, Lee's Summit, MO 64063

### II.  EFFECTIVE TIME

This Power of Attorney shall become effective immediately and shall continue to be effective for one year or until I give written notice of cancellation to the address listed above.

### III.  POWERS OF ATTORNEY-IN-FACT

My attorney-in-fact shall have the power to act in my name, place and stead in any way which I myself could do with respect to the following matters to the extent permitted by law:

**The power to:** **Act on my behalf in negotiating payment terms with my creditors and also the power to submit letters on my behalf to all credit bureaus and receive documents that relate to my credit and credit history; that shall include credit reports, prior dealings with creditors and settlement offerings made by creditor. The power to file suit and other legal remedies should the need arise in my situation.  I understand that I will be notified prior to any such filing.**

My attorney-in-fact is empowered to take all further action, including the payment of expenditures and the preparation and execution of all documents, as the attorney-in-fact deems necessary or appropriate in order to fully effectuate these matters.

**IN WITNESS WHEREOF**, the undersigned has executed this Power of Attorney on the date set forth below.

Date: 12/29/2016 _____

DocuSigned by:
*Michael Wood* _____
Signature of Client

Michael Wood _____
Client Printed Name

Credit Law Center
4041 NE Lakewood Way Suite 140
Lee's Summit 64063

DCC

KANSAS CITY
MO 640
28 APR '17
PM 2 1

PENTAGON FEDERAL CR UN
PO BOX 1432
ALEXANDRIA VA 22313-1432



$0.460
US POSTAGE
FIRST-CLASS
FROM 64064
APR 27 2017
stamps
.com

0025000814702O

**EXHIBIT D**

| LotNo | Repurchase LotNo | Card Number | FirstName | MI | LastName | Suffix | SSN |
|-------|------------------|-------------|-----------|-----|----------|--------|-----|
| LOT799 | LOT1245 | ████████0267 | MICHAEL J | J | WOOD | | ████0043 |

| Address 1 | Address 2 | City | State | Zip | Country Code | HomePh |
|---|---|---|---|---|---|---|
| 4555 N KOSTNER AVE | | CHICAGO | IL | 606304109 | | 312-952-0090 |

| CellPh | WorkPh | DOB | Email | Alt Email | Employer |
|--------|--------|-----|-------|-----------|----------|
| | 312 870-0659 | ███/76 | MJWOOD@GMAIL.COM | | MOTOROLA INC. |

| Co_FirstName | Co_MI | Co_LastName | Co_SSN | Co_Address 1 | Co_Address 2 | Co_City | Co_State |
|---|---|---|---|---|---|---|---|

| Co_Zip | Co_HomePh | Co_CellPh | Co_DOB | Co_Email | Co_Alt Email | Co_Employer | Product Group |
|--------|-----------|-----------|--------|----------|--------------|-------------|---------------|
|        |           |           |        |          |              |             | Visa          |

| Debt to Income Ratio | FICO at Origination | Current Balance | Charged Off Principal |
|---|---|---|---|
| ██ | ██ | 15,325.47 | |

| Charged Off Interest | Charge Off Amt | Effective Last Payment Amount | Charge Off Date |
|---|---|---|---|
| | 15,325.47 | 283.00 | 8/28/14 |

| Interest Rate | Delinquent Start Date | Card Open Date | Effective Last Payment Date |
|---|---|---|---|
| 11.49 | 1/17/14 | 8/2/11 | 12/13/13 |

| External Status | Agency Assigned | Nbr of Agencies Assigned |
|---|---|---|
| Z | None | None |

| Total Amount Paid Post Charge-Off | DueDil Acct ID |
|---|---|
| 0.00 | 2516 |

**EXHIBIT E**

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

_____ )

**FEDERAL TRADE COMMISSION**,                  )
                                               )
                                               )
                                               )
                 Plaintiff,                     )
                                               )
v.                                             )
                                               )
**SECURITY CREDIT SERVICES, LLC**,              )
a limited liability company, and               )
                                               )
**JACOB LAW GROUP, PLLC**,                      )
a professional limited liability company,       )
                                               )
                 Defendants.                    )
                                               )
_____ )

## COMPLAINT FOR PERMANENT INJUNCTION AND
## OTHER  EQUITABLE RELIEF

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its

Complaint alleges:

1.      The FTC brings this action under Sections 13(b) and 19 of the

Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and

Section 814 of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C.

§ 1692*l*, to obtain permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the FDCPA, 15 U.S.C. § 1692 *et seq.*

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and under 15 U.S.C. §§ 45(a), 53(b), 57b and 1692*l*.

3.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)-(c) and 15 U.S.C. § 53(b).

## PLAINTIFF

4.     The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce, and the FDCPA, 15 U.S.C. §§ 1692-1692p, which prohibits deceptive, abusive, and unfair debt collection practices.

5.     The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and FDCPA, and to secure

such equitable relief as may be appropriate in each case, including rescission or

reformation of contracts, restitution, the refund of monies paid, and the

disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b), 56(a)(2)(A), 56(a)(2)(B),

57b, and 1692*l*(a).

## DEFENDANTS

6.      Defendant Security Credit Services, LLC ("Security Credit"), is a

Mississippi limited liability company with its principal place of business located at

2512 Jackson Avenue, Oxford, Mississippi 38655.  At all times relevant to this

Complaint, Security Credit Services transacts or has transacted business in this

district and throughout the United States.

7.      Security Credit is a "debt collector" as defined in Section 803(6) of

the FDCPA, 15 U.S.C. § 1692a(6).

8.       Defendant Jacob Law Group, PLLC ("Jacob Law"), is a Mississippi

professional limited liability company with its principal place of business located

at 1420 North Lamar, Suite 101, Oxford, Mississippi 38655.  At all times relevant

to this Complaint, Jacob Law transacts or has transacted business in this district

and throughout the United States.

9.     Jacob Law is a "debt collector" as defined in Section 803(6) of the FDCPA, 15 U.S.C. § 1692a(6).

## COMMERCE

10.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS PRACTICES

11.     Since at least 2006, Defendants Security Credit and Jacob Law have engaged in consumer debt collection activities nationwide.

12.     Security Credit purchases portfolios of defaulted and charged-off consumer debts from creditors, including credit card issuers, consumer finance companies, financial institutions, telecommunications providers, and retailers. Security Credit has purchased approximately 1.5 million consumer debt accounts and its portfolio of debts in 2011 totaled more than $463 million.

13.     After purchasing consumer debt portfolios, Security Credit assigns the debts to pools of independent investors. Security Credit collects or attempts to collect the debts on behalf of the investor pools using the services of third party debt collectors. The investor pools earn a return on their investment and Security

Credit earns a fee for overseeing or managing the debt collection activities.

14.     Security Credit determines a collection strategy for each consumer debt account.  In order to do so, Security Credit obtains and uses a recovery score from credit reporting agencies which rates each consumer's propensity to pay a debt.  Each consumer debt account is placed into one of three categories, based upon the consumer's recovery score:  (a) consumers rated as unlikely to pay are placed into "agency" files; (b) consumers rated likely to pay are placed into "asset" files; and (c) consumers rated only moderately likely to pay are placed into "dark grey" files.  Security Credit pursues different collection strategies for each of the three categories of consumer debt accounts.

15.     Security Credit places all "agency" files with third party debt collectors for debt collection services that do not include the filing of lawsuits. Security Credit may recall the "agency" files and transfer the accounts from one debt collector to another, but they do not generally authorize the filing of lawsuits to collect these accounts.  Instead, Security Credit relies upon traditional debt collection services, including dunning letters and collection calls, to collect "agency" file accounts.

16.     Security Credit initially places "asset" and "dark grey" accounts with debt collectors for traditional debt collection services that include dunning letters and collection calls.  After six months, Security Credit usually transfers "asset" files to debt collector law firms to collect by continuing traditional debt collection actions as well as by filing lawsuits to collect the debts.  Security Credit typically transfers "dark grey" files to debt collector law firms to pursue through the filing of lawsuits after a year or more of collection activity.

17.     Defendant Jacob Law is a third party debt collector employed by Security Credit.  Jacob Law is a Mississippi law firm that specializes in national consumer debt collection and creditor's rights.  Jacob Law provides Security Credit with debt collection services on both non-litigation and litigation files. Jacob Law's non-litigation services include locating address and contact information concerning consumers (commonly called "skip-tracing"), issuing collection notices and dunning letters, and contacting consumers by telephone to induce payment of the debts.  Although it engages in debt collection activities in all 50 states, Jacob Law is only licensed to file debt collection lawsuits in Mississippi, Tennessee, and Arkansas.

18.     Prior to 2011, Security Credit was Jacob Law's only client.  As
of the date of this Complaint, nearly 80 percent of Jacob Law's work is performed
for or on behalf of Security Credit.  Jacob Law has collected or attempted to
collect more than 300,000 consumer debt accounts nationwide on behalf of
Security Credit since 2008, and has filed more than 5,600 debt collection lawsuits
for Security Credit during that time period.

19.     Security Credit forwards consumer debt portfolios to its third party
debt collectors, including Jacob Law, in electronic databases for collection on
behalf of Security Credit.  The electronic databases typically include the consumer
account holder's name, last known address and telephone number, the account
number and balance (including applicable interest), the last payment date and/or
the charge-off date, the consumer's Social Security number, and employment
information.  Files that Security Credit did not approve for litigation are loaded
into an accounts receivable management program called Artiva, while accounts
that are approved for litigation are loaded into a database called Collection-
Master.

20.     After receiving consumer debt accounts and loading the accounts into
either Artiva or Collection-Master, Jacob Law updates consumers' address and

contact information, and scrubs the files to remove accounts for consumers who are serving in the U.S. military, have filed for bankruptcy protection, or are incarcerated or deceased.

21.     Jacob Law sends initial collection notices to consumers, advising consumers that their Security Credit account has been placed for collections, that they have a right to contest the validity of the debt, and that they may remit payment by contacting an account representative, mailing payment, or paying online at www.jacoblawgroup.com.  The collection notices do not inform consumers that additional fees or charges may be imposed for payments authorized by telephone.

22.     In addition to mailing collection notices and dunning letters, Jacob Law attempts to collect debts for Security Credit by telephoning consumers and asking for payment.  While collecting debts, Jacob Law pressures consumers to immediately pay the account by authorizing electronic checks or credit or debit card payments over the telephone.

23.     Jacob Law's account representatives tell consumers that in addition to paying the debt owed, they must also pay a fee of $18.95.  Jacob Law provides varied and inconsistent explanations to consumers regarding the assessment of the

fee, including that "all payments" are subject to the fee, that the fee covers the costs of "having the account at the attorney's office," and that the fee offsets the "costs of communicating with credit reporting agencies or creditors." When consumers challenge the legality of the fee, Jacob Law's account representatives assert that the $18.95 fee is lawful and that consumers must pay the fee.

24. Jacob Law tells consumers that they must pay the $18.95 fee and leads consumers to believe that the fee is unavoidable. In fact, the fee only applies to transactions that are authorized by telephone and consumers may pay using fee-free alternatives, such as by mailing the payment or paying online at www.jacoblawgroup.com.

25. Often, Jacob Law's account representatives falsely represent or imply that consumers who authorize periodic payments by telephone will incur only one $18.95 fee when, in fact, the consumer will incur an $18.95 fee for each periodic payment. Likewise, in some instances, Jacob Law tells consumers that fees will be waived, but then charges consumers the fee.

26. Often, consumers who are contacted by debt collectors are in financial distress and the imposition of the additional fees is burdensome. Many consumers are unaware that the $18.95 fee has been added to their debt. Other

consumers are aware of the fee but, because Jacob Law falsely asserted that the fee had to be paid, did not know that they could avoid the fee by mailing their payment or paying through Jacob Law's website.

27.     Since 2008, Defendants have collected at least $799,958 in fees from consumers using misrepresentations, all of which was paid to Security Credit pursuant to the parties' agreement.

28.     While collecting debts, Jacob Law account representatives often threaten that lawsuits will be initiated against consumers if consumers fail to pay their debts. Often, when these threats of suit are made, Jacob Law does not have the authority or intent to initiate such lawsuits either because Security Credit has not approved the account for litigation or because the consumer does not reside in a jurisdiction in which Jacob Law is licensed to file lawsuits.

## VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT

29.     In 1977, Congress passed the FDCPA, 15 U.S.C. §§ 1692 *et seq.*, which became effective on March 20, 1978, and has been in force since that date. Section 814 of the FDCPA, 15 U.S.C. § 1692*l*, authorizes the Commission to use all of its functions and powers under the FTC Act to enforce compliance with the FDCPA by any debt collector, irrespective of whether that debt collector is

engaged in commerce or meets any other jurisdictional tests set by the FTC Act.

The authority of the Commission in this regard includes the power to enforce the

provisions of the FDCPA in the same manner as if the violations of the FDCPA

were violations of a Commission trade regulation rule.

## COUNT I

30.    Section 807 of the FDCPA, 15 U.S.C. § 1692e, prohibits debt

collectors from using any false, deceptive, or misleading representation or means

in connection with the collection of any debt.

31.    In numerous instances, in connection with the collection of debts,

Defendants represent, directly or indirectly, expressly or by implication, that

consumers are required to pay a fee of $18.95.

32.    In truth and in fact, consumers are not required to pay an $18.95 fee.

An $18.95 fee applies only to payments that consumers authorize by telephone.

Consumers are not told that they may pay using fee-free payment options,

including mailing payments or paying online at www.jacoblawgroup.com.

33.    The act or practice alleged in Paragraph 31 constitutes a violation of

Section 807 of the FDCPA, 15 U.S.C. § 1692e.  Pursuant to Section 814(a) of the

FDCPA, 15 U.S.C. § 1692*l*(a), the act or practice alleged in Paragraph 31 also

constitutes an unfair or deceptive act or practice in violation of Section 5(a) of the

FTC Act, 15 U.S.C. § 45(a).

## COUNT II

34.     Section 807(5), 15 U.S.C. § 1692e(5), prohibits a debt collector from

threatening to take any action that cannot legally be taken or that is not intended to

be taken.

35.     In numerous instances, in connection with the collection of debts,

Defendants represent, directly or indirectly, expressly or by implication, that

nonpayment of a past due debt will result in the filing of a lawsuit against the

consumer.

36.     In truth and in fact, in numerous instances, Defendants do

not have authority to or do not intend to file a lawsuit against the consumer.

37.     The act or practice alleged in Paragraph 35 constitutes a violation

of Section 807(5) of the FDCPA, 15 U.S.C. § 1692e(5).  Pursuant to Section

814(a) of the FDCPA, 15 U.S.C. § 1692*l*(a), the act or practice alleged in

Paragraph 35 also constitutes an unfair or deceptive act or practice in violation of

Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF SECTION 5 OF THE FTC ACT

38.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

39.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

## COUNT III

40.     In numerous instances, in connection with the collection of debts, Defendants represent, directly or indirectly, expressly or by implication, that consumers are required to pay Defendants a fee of $18.95.

41.     In truth and in fact, consumers are not required to pay the $18.95 fee. In fact, the $18.95 fee applies only to payments authorized by telephone and consumers are not told that they may pay using fee-free payment options, including mailing payments or paying online at www.jacoblawgroup.com.

42.      Defendants' representation as set forth in Paragraph 40 is false or misleading and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT IV

43.     In numerous instances, in connection with the collection of debts,

Defendants represent, directly or indirectly, expressly or by implication, that

nonpayment of an account will result in the filing of a lawsuit against the

consumer.

44.     In truth and in fact, in numerous instances, Defendants do not have

authority to or do not intend to file a lawsuit against the consumer.

45.     Defendants' representation set forth in Paragraph 43 is false and

misleading and constitutes a deceptive act or practice in violation of Section 5(a)

of the FTC Act, 15 U.S.C. § 45(a).

## CONSUMER INJURY

46.     Consumers have suffered and will continue to suffer substantial injury

as a result of Defendants' violations of the FTC Act and FDCPA.  In addition,

Defendants have been unjustly enriched as a result of their unlawful acts or

practices.  Absent injunctive relief by this Court, Defendants are likely to continue

to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

47.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this

Court to grant injunctive and such other relief as the Court may deem appropriate

to halt and redress violations  of any provision of law enforced by the FTC.  The

Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

48. Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 814(a) of the FDCPA, 15 U.S.C. § 1692*l*(a), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FDCPA, including the rescission or reformation of contracts, and the refund of money.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, Section 814(a) of the FDCPA, 15 U.S.C. § 1692*l*, and the Court's own equitable powers, respectfully requests that the Court:

A. Enter a permanent injunction to prevent future violations of the FTC Act and FDCPA by Defendants;

B. Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act and FDCPA, including, but not limited to, rescission or reformation of contracts, restitution, the

refund of monies paid, and the disgorgement of ill-gotten monies; and

C.     Award Plaintiff the costs of bringing this action, as well as such other

and additional relief as the Court may determine to be just and proper.

Dated: March 13, 2013                Respectfully submitted,

                                     DAVID SHONKA
                                     Acting General Counsel


                                     /s/ Chris Couillou
                                     Chris Couillou
                                     Georgia Bar: 190062
                                     Email: ccouillou@ftc.gov
                                     Tel. (404) 656-1353

                                     Dama J. Brown
                                     Email: dbrown1@ftc.gov
                                     Tel. (404) 656-1361

                                     Attorneys for Plaintiff
                                     **FEDERAL TRADE COMMISSION**
                                     225 Peachtree Street N.E., Suite 1500
                                     Atlanta, Georgia 30303
                                     Facsimile: (404) 656-1379

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |  |
|---|---|---|
| **FEDERAL TRADE COMMISSION**, | ) | |
| Plaintiff, | ) | Civil No. |
| v. | ) | |
| **SECURITY CREDIT SERVICES, LLC**, a limited liability company, and | ) | |
| **JACOB LAW GROUP, PLLC**, a professional limited liability company, | ) | |
| Defendants. | ) | |

## STIPULATED FINAL JUDGMENT AND
## ORDER FOR PERMANENT INJUNCTION

Plaintiff, Federal Trade Commission ("FTC" or "Commission") commenced this civil action pursuant to Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and Section 814 of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692*l*, to obtain permanent injunctive and other equitable relief for Defendants' violations of

Section 5 of the FTC Act, 15 U.S.C. § 45(a), and the FDCPA, 15 U.S.C. §§ 1692-1692p, in connection with the collection of consumer debts.

The FTC and Defendants Security Credit Services, LLC, and Jacob Law Group, PLLC, by and through their respective attorneys, have agreed to entry of this Stipulated Final Judgment and Order for Permanent Injunction ("Final Order") by this Court in order to resolve all claims between them in this action.

Being fully advised in the premises and acting upon the joint motion of the parties to enter this Final Order, it is hereby ORDERED, ADJUDGED AND DECREED as follows:

## FINDINGS

1.     This court has jurisdiction over the subject matter of this case and personal jurisdiction over the parties.

2.     The Complaint states a claim upon which relief may be granted against Defendants under Sections 5(a), 13(b), and 19 of the FTC Act, 15 U.S.C. §§ 45(a), 53(b), and 57b, and the FDCPA, 15 U.S.C. §§ 1692-1692p.

3.     Venue in the Northern District of Georgia is proper, pursuant to 28 U.S.C. §§ 1391(b)-(c), 1395(a), and 15 U.S.C. § 53(b).

4.     The activities of the Defendants are or were in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

5.     Plaintiff and Defendants, by and through their counsel, stipulate and agree to entry of this Final Order without trial or final adjudication of any issue of fact or law, to settle and resolve all matters in dispute arising from the conduct alleged in the Complaint to the date of entry of this Final Order.

6.     Defendants further waive all rights to seek judicial review or otherwise challenge or contest the validity of this Final Order and any claim that they may have against the Plaintiff, the Federal Trade Commission, its employees, representatives, or agents, including any claim under the Equal Access to Justice Act, 28 U.S.C. § 2412, amended by Pub. L. 104-121, 110 Stat. 847, 863- 64 (1996).  Each party shall each bear their own costs and attorney's fees incurred in this action.

7.     Defendants neither admit nor deny any of the allegations in the Complaint, except as specifically stated in this Final Order.  Only for purposes of this action, Defendants admit the facts necessary to establish jurisdiction.

8.     Entry of this Final Order is in the public interest.

## DEFINITIONS

1.     **"Assisting others"** includes, but is not limited to:  (a) performing customer service functions, including receiving or responding to consumer complaints; (b) formulating or providing, or arranging for the formulation or provision of, any debt collection materials, including, but not limited to, any debt collection script, debt collection marketing material, debt collection training material, debt collection communications, notices or form letters, or debt collection compliance monitoring materials.

2.     **"Commission"** or **"FTC"** means the Federal Trade Commission.

3.     **"Debt collection"** means any activity the principal purpose of which is to collect or attempt to collect, directly or indirectly, debts owed, or asserted to be owed, or due.

4.     **"Defendants"** means Security Credit Services, LLC, and Jacob Law Group, PLLC, and their successors and assigns.

## I.     INJUNCTION

**IT IS HEREBY ORDERED** that Defendants, their officers, agents, servants, employees, attorneys, and all other persons in active concert or

participation with any of them, who receive actual notice of this Final Order, whether acting directly or indirectly, in connection with collecting or attempting to collect debts, are permanently restrained and enjoined from:

1. Making any material misrepresentation or assisting others in making any material misrepresentation, expressly or by implication, to collect or attempt to collect a debt, including, but not limited to:

   a. Falsely representing that consumers are required to pay a fee; or

   b. Falsely representing that nonpayment of a debt will result in the filing of a lawsuit against the consumer;

2. Failing to disclose to consumers truthfully, clearly and prominently, and before the consumers agree to pay, that:

   a. A fee will be charged;

   b. The amount of the fee;

   c. The number of times the fee will be charged;

   d. The reason for the fee; and

   e. How consumers can avoid paying the fee;

3.  Using any false, deceptive, or misleading representation or means in connection with the collection of any debt, including, but not limited to:

    a.  Representing or implying that any action will be taken unless, at the time of the representation, such action is lawful and Defendants and the creditor intend to take such action; or

    b.  Representing or implying that any action may be taken unless Defendants can show that, at the time of the representation, there is a reasonable likelihood that such action will be taken.

## II.   MONETARY RELIEF

**IT IS FURTHER ORDERED** that:

A.   Judgment is hereby entered against Defendants, jointly and severally, in the amount of Seven Hundred Ninety Nine Thousand, Nine Hundred and Fifty Eight Dollars ($799,958.00), for the payment of equitable monetary relief, including, but not limited to, consumer redress and disgorgement, and for paying any attendant expenses of administration of any redress fund.

B.     In satisfaction of the judgment, Defendants shall pay to the FTC or its designated agent Seven Hundred Ninety Nine Thousand, Nine Hundred and Fifty Eight Dollars ($799,958.00), on or before the fourteenth day following entry of this Final Order by electronic fund transfer in accordance with the instructions provided by Plaintiff.

C.     In the event of any default in payment, which default continues for ten (10) days beyond the due date of the payment, the entire unpaid amount, together with interest, as computed pursuant to 28 U.S.C. § 1961 from the date of default to the date of payment, shall immediately become due and payable.

D.     All funds paid to the Commission pursuant to this Section shall be deposited into a fund administered by the Commission or its agent to be used for equitable relief, including but not limited to consumer redress and any attendant expenses for administration of such equitable relief fund.  Defendants will cooperate fully to assist the Commission in identifying consumers who may be entitled to redress pursuant to this Final Order.  If the Commission determines, in its sole discretion, that redress to consumers is wholly or partially impracticable, or funds remain after redress is completed, the Commission may apply any remaining funds for any other equitable relief (including consumer information

remedies) that it determine to be reasonably related to the practices alleged in the

Complaint. Any funds not used for this equitable relief shall be deposited into the

U.S. Treasury as disgorgement. Defendants shall have no right to challenge the

Commission's choice of remedies or the manner of distribution chosen by the

Commission.

E. Proceedings initiated hereunder are in addition to, and not in lieu of,

any other civil or criminal penalties that may be provided by law, including any

other proceedings the Plaintiff may initiate to enforce this Final Order.

## III. BANKRUPTCY PROVISIONS FOR MONETARY RELIEF SECTION OF ORDER

**IT IS FURTHER ORDERED** that:

A. Defendants relinquish all dominion, control, and title to the funds

paid to the fullest extent permitted by law. Defendants shall make no claim to or

demand for return of the funds, directly or indirectly, through counsel or

otherwise.

B. Defendants agree that the facts as alleged in the Complaint filed in

this action shall be taken as true without further proof in any bankruptcy case or

subsequent civil litigation pursued by the Commission to enforce its rights to any

payment or money judgment pursuant to this Final Order, including but not limited to a nondischargeability complaint in any bankruptcy case. Defendants further stipulate and agree that the facts alleged in the Complaint establish all elements necessary to sustain an action by the Commission pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, 11 U.S.C. § 523(a)(2)(A), and that this Final Order shall have collateral estoppel effect for such purposes.

## IV.  ORDER ACKNOWLEDGMENTS

**IT IS FURTHER ORDERED** that Defendants obtain acknowledgments of receipt of this Final Order:

A.    Each Defendant, within seven (7) days of entry of this Final Order, must submit to the Commission an acknowledgment of receipt of this Final Order sworn under penalty of perjury.

B.    For five (5) years after entry of this Final Order, each Defendant must deliver a copy of this Final Order  to:  (1) all principals, officers, directors, and managers; (2) all employees, agents, and representatives who participate in debt collection; and (3) any business entity resulting from any change in structure as set forth in the Section titled Compliance Reporting.  Delivery must occur within seven (7) days of entry of this Final Order for current personnel.  To all others,

delivery must occur before they assume their responsibilities.

C.       From each individual or entity to which a Defendant delivered a copy

of this Final Order, that Defendant must obtain, within thirty (30) days, a signed

and dated acknowledgment of receipt of this Final Order.

## V.       COMPLIANCE REPORTING

**IT IS FURTHER ORDERED** that Defendants make timely submissions to

the Commission:

A.       One year after entry of this Final Order, each Defendant must submit

a compliance report, sworn under penalty of perjury.  Each Defendant must:  (1)

designate at least one telephone number and an email, physical, and postal address

as points of contact, which representatives of the Commission may use to

communicate with Defendant; (2) identify all of that Defendant's businesses by all

of their names, telephone numbers, and physical, postal, email, and Internet

addresses; (3) describe the activities of each business, including the products and

services offered, the means of advertising, marketing, and sales, and the

involvement of any other Defendant; (4) describe in detail whether and how that

Defendant is in compliance with each Section of this Final Order; and (5) provide

a copy of each Order Acknowledgment obtained pursuant to this Final Order,

unless previously submitted to the Commission;

      B.     For five (5) years following entry of this Final Order, each Defendant must submit a compliance notice, sworn under penalty of perjury, within fourteen (14) days of any change in the following:  (1) any designated point of contact; or (2) the structure of Defendant or any entity that Defendant has any ownership interest in or directly or indirectly controls that may affect compliance obligations arising under this Final Order, including:  creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Final Order.

      C.     Each Defendant must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or any similar proceeding by or against such Defendant within fourteen (14) days of its filing.

      D.     Any submission to the Commission required by this Final Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding:  "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on:_____" and supplying the date, signatory's full name, title (if applicable), and signature.

E.     Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin: *FTC v. Security Credit Services, LLC and Jacob Law Group, PLLC*, Matter No. 123175.

## VI.  RECORDKEEPING

**IT IS FURTHER ORDERED** that Defendants must create certain records for five (5) years after entry of the Final Order, and retain each such record for five (5) years. Specifically, Defendants, in connection with the collection of debts, must maintain the following records:

A.     Accounting records showing that reflect the revenues generated in connection with the collection of debts, including any fees charged to consumers, all costs incurred in generating those revenues, the disbursement of such revenues, and the resulting net profit or loss;

B.     Personnel records showing, for each person providing services, whether as an employee or otherwise, that person's:  name, addresses, and

telephone numbers; job title or position; dates of service; and, if applicable, the reason for termination;

     C.    Consumer files containing the names, addresses, phone numbers, dollar amounts of debt owed, records of collection activity, and amounts collected;

     D.    Complaints and refund requests, whether received directly or indirectly, such as through a third party, that include:

          1.    Any complaint and the date received, and the nature of the complaint as reflected in any notes, logs, or memoranda, including a description of the conduct alleged; and

          2.    The basis of the complaint, including the names of any debt collectors or supervisors complained about; the nature of any investigation conducted concerning the validity of any complaint;

          3.    All documents relating to the disposition of the complaint, including records of all contacts with the consumer, Defendant's response(s) to the complaint and the response date, whether the complaint was resolved, the date of resolution, and any action taken to correct the conduct complained about;

E.  Copies of all scripts, training materials, form letters and emails, or other materials used in connection with communicating to consumers;

F.  Copies of all advertisements and other marketing materials; and

G.  All records necessary to demonstrate full compliance with each provision of this Final Order, including all submissions to the Commission.

## VII.  COMPLIANCE MONITORING

**IT IS FURTHER ORDERED** that, for the purpose of monitoring Defendants' compliance with this Final Order:

A.  Within fourteen (14) days of receipt of a written request from a representative of the Commission, each Defendant must: submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce documents, for inspection and copying. The Commission is also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69.

B.     For matters concerning this Final Order, the Commission is
authorized to communicate directly with each Defendant.  Defendant must permit
representatives of the Commission to interview any employee or other person
affiliated with any Defendant who has agreed to such an interview.  The person
interviewed may have counsel present.

C.     The Commission may use all other lawful means, including posing,
through its representatives, as consumers, suppliers, or other individuals or
entities, to Defendants or any individual or entity affiliated with Defendants,
without the necessity of identification or prior notice.  Nothing in this Final Order
limits the Commission's lawful use of compulsory process, pursuant to Sections 9
and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

## VIII.  RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court retains jurisdiction of this
matter for purposes of construction, modification, and enforcement of this Final
Order.

**DONE AND ORDERED** in Chambers in Atlanta, Fulton County, Georgia
this 19th day of      March      , 2013.

s/ CLARENCE COOPER
United States District Judge

Page 15 of 17

STIPULATED AND AGREED TO:

For the Plaintiff:

CHRIS COUILLOU
Georgia Bar: 190062
Email: ccouillou@ftc.gov

DAMA J. BROWN
Email: dbrown1@ftc.gov

225 Peachtree Street, N.E.
Suite 1500
Atlanta, Georgia 30303
Telephone: (404) 656-1361
Facsimile: (404) 656-1379

Attorneys for Plaintiff
**Federal Trade Commission**

For the Defendants:

**Security Credit Services, LLC**
By Its: Managing Member
WILLIAM ALIAS III

**Jacob Law Group, PLLC**
By Its: Managing Member
MICHAEL JACOB

Page 16 of 17

**ANTHONY E. DIRESTA**
Georgia Bar No. 222675
Email: adiresta@winston.com

Winston & Strawn, LLP
1700 K Street, N.W.
Washington D.C., 20006
Telephone: (202) 282-5000
Facsimile: (202) 282-5100

Attorney for Defendants
**Security Credit Services, LLC**
**Jacob Law Group, PLLC**

## **<u>CERTIFICATE OF SERVICE</u>**

I certify that I served a copy of the foregoing document on Defendant via its attorney of record, electronically by using the CM/ECF system on this 5th day of November, 2021.


By:     /s *Mario Kris Kasalo*
One of Plaintiff's Attorneys