**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MICHAEL WOOD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 1:20-cv-02369 |
| ) | |
| SECURITY CREDIT SERVICES, LLC ) | |
| d/b/a EQUIPRO INVESTMENTS, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant, Security Credit Services, LLC ("SCS"), by and through its undersigned counsel and pursuant to Local Rule 56.1 hereby submits the following statements of material fact as to which it contends there is no genuine issue and that entitle it to a judgment as a matter of law:

1. Plaintiff Michael Wood ("Wood"), an Illinois resident, incurred a credit card debt (the "Debt") to Pentagon Federal Credit Union ("PenFed"). *See* Doc. #69 (Second Amended Complaint) at ¶¶6, 14; Wood Deposition Trans. at 16:3-7 (admitting credit card was issued by PenFed), 41:9-11 (admitting PenFed is the original creditor of the Debt), relevant excerpts attached hereto as **Exhibit A**.

2. The Debt was charged off by Pen-Fed on August 28, 2014; at the time of charge-off, the balance on the Debt was $15,325.47. *See* **Exhibit A** at 16:12-21; Declaration of Richard Hauft at ¶6, attached hereto as **Exhibit B**.

3. Prior to charge-off, PenFed sent monthly billing statements to Wood, including a final statement with a closing date of August 18, 2014 that identified the balance of the Debt

1

as $15,325.47. *See* **Exhibit A** at 12:1-5 (Wood admits residing at address appearing on statements), 12:20-24 (Wood admits receiving billing statements); 30:5-8 (same); **Exhibit B** at ¶¶6-7; *id.* at Exhibit 1.

4. Wood never notified PenFed there were any billing errors appearing in the monthly billing statements sent to him. *See* **Exhibit B** at ¶¶8-9; Wood's Amended Response to Interrogatory No. 14 and Request to Produce No. 7, attached hereto as **Exhibit C** (identifying April 26, 2017 letter from Credit Law Center and May 16, 2017 letter from PenFed as only communications with PenFed regarding the subject debt); *see also* **Exhibit A** 30:9-12 (Wood has no recollection of ever disputing or contesting billing statements).

5. However, approximately two years and eight months after the Debt was charged off, PenFed received a letter from Credit Law Center dated April 26, 2017 that generically asserted that Wood disputed the credit information being reported by PenFed for the Debt. *See* Doc. #69 at ¶19; *id.* at p. 26-28; **Exhibit B** at ¶10; *id.* at Exhibit 2.

6. PenFed investigated the dispute and determined the Debt to be valid and accurately reported. *See* **Exhibit B** at ¶11; *see also* Doc. #69 at ¶¶29, 33, 48.

7. On or about May 16, 2017, PenFed sent Credit Law Center the results of its dispute investigation. *See* **Exhibit B** at ¶11; *id.* at Exhibit 3.

8. Neither Wood nor Credit Law Center ever communicated to PenFed that Wood disagreed with the results of PenFed's investigation which found the Debt to be valid and accurately reported. *See* **Exhibit B** at ¶¶12-14; *see also* **Exhibit A** at 47:23-48:11 (Wood has no knowledge of Credit Law Center ever responding to PenFed's May 16, 2017 letter), 53:22-54:21 (Wood did not expect Credit Law Center to take any further action

and was satisfied with the services provided); **Exhibit C** at Interrogatory No. 14 and Request to Produce No. 7 (identifying April 26, 2017 letter from Credit Law Center and May 16, 2017 letter from PenFed as only communications with PenFed regarding the subject debt).

9. Wood agrees that he owes an amount on the Debt and has no opinion as to the amount owed. *See* **Exhibit A** at 51:12-17.

10. Wood claims to have disputed the Debt in April 2017 because the balance "was higher than what he remembered it could have been[.]" *See* **Exhibit C** at Interrogatory No. 6.

11. At all relevant times, PenFed used Metro 2 Format – a standard data specification developed by the Consumer Data Industry Association ("CDIA") and published in the CDIA's Credit Reporting Resource Guide – to furnish information regarding consumer credit accounts to the national credit reporting agencies. *See* **Exhibit B** at ¶15.

12. Following PenFed's investigation into its credit reporting of the Debt, PenFed reported the "XH" Metro 2 compliance condition code for the Debt to the national credit reporting agencies. *See* **Exhibit B** at ¶16.

13. The "XH" compliance condition code is used by PenFed when an account was previously disputed under the Fair Credit Reporting Act ("FCRA") but PenFed's investigation of the dispute resolves the dispute. *See* **Exhibit B** at ¶16.

14. At no time did PenFed ever report an "XB" or "XC" Metro 2 compliance condition code for the Debt. *See* **Exhibit B** at ¶17; *see also* **Exhibit A** at 47:10-13 (Wood has no personal knowledge of credit reporting codes utilized by PenFed).

15. The "XB" code is used by PenFed when an investigation of an FCRA dispute remains pending, while the "XC" code is used by PenFed when PenFed has completed its

investigation of an FCRA dispute, but the consumer disagrees with the results of PenFed's investigation. *See* **Exhibit B** at ¶17.

16. Wood does not know whether the notation "This item was updated from our processing of your dispute in May of 2017" alleged by him to have appeared in connection with PenFed's tradeline for the Debt was a notation added by the credit reporting agency or PenFed. *See* **Exhibit A** at 61:5-13; Doc. #69 at ¶20; *id.* at p. 18.

17. On or about July 30, 2018, PenFed sold a pool of charged-off accounts, including the Debt, to SCS, pursuant to a written purchase agreement dated July 25, 2018 (the "Purchase Agreement"). *See* **Exhibit B** at ¶19; Doc. #19-2 (Declaration of Brett Soldevila) at ¶6, Exhibit 1; Doc. #69 at ¶23.

18. Pursuant to the Purchase Agreement, PenFed represented and warranted to SCS, among other things: (1) that PenFed used commercially reasonable efforts to remove from the pool of accounts being purchased accounts with "unresolved disputes"; (2) that every account being purchased had been maintained and serviced in full compliance with the FCRA; and (3) that PenFed had not omitted any material information relating to the accounts being purchased which PenFed had actual knowledge, which omission would adversely affect SCS' ability to seek recovery on the accounts. *See* **Exhibit B** at ¶8; Doc. #19-2 at ¶7, Exhibit 1; Doc. #69 at ¶41.

19. The aforementioned representations and warranties from PenFed were obtained as a result of negotiations between SCS and PenFed. *See* Kaye Dreifuerst Deposition Trans. at 53:9-54:2, relevant excerpts attached hereto as **Exhibit D**.

20. SCS is not interested in purchasing disputed accounts (which accounts are not good for business) and negotiated the aforementioned representations and warranties from PenFed

in an effort to ensure that it did not purchase any accounts subject to a present dispute. *See* Declaration of Brett Soldevila at ¶¶14-17, a true and accurate copy of which is attached hereto as **Exhibit E**; *see also* **Exhibit D** at 34:3-4 ("That's the business we're in, *not purchasing* open, unresolved disputes.") (emphasis added).

21. At all relevant times, the term "unresolved disputes" as used in the Purchase Agreement has been understood by both PenFed and SCS to mean disputes that were not resolved to the satisfaction of both PenFed and the accountholder. *See* **Exhibit B** at ¶21; **Exhibit D** at 58:24-59:7; **Exhibit E** at ¶18.

22. The term covers accounts for which a dispute investigation has not yet been completed by PenFed as well as accounts where the accountholder disagrees with the results of PenFed's investigation. *See* **Exhibit E** at ¶18; **Exhibit D** at 29:4-13, 59:13-18, 80:7-24.

23. PenFed and SCS' mutual understanding of "unresolved disputes" was achieved through "robust" discussions between the entities ahead of executing the Purchase Agreement and "best practices" in the debt buying and collection industry. *See* **Exhibit D** at 29:14-24, 32:13-33:18, 81:5-17.

24. PenFed and SCS agreed that Virginia law controls the interpretation of the Purchase Agreement. *See* **Exhibit E** at Exhibit 3, § 17.7.

25. In connection with the sale of the Debt to SCS, PenFed transmitted an electronic sale file to SCS which contained account level information for the Debt. *See* **Exhibit B** at ¶22; Doc. #19-2 at ¶8; Doc. #69 at ¶24.

26. Information contained in the sale file included among other things: Wood's name, social security number, address, and phone number; the account balance; the charge-off date and amount; the last payment date and amount; and the account open date. *See* Exhibit 4

to **Exhibit B**; Doc. #19-2 at p. 35-44; Doc. #69 at p. 30-39.

27. PenFed did not provide SCS with copies of the April 26, 2017 and May 16, 2017 letters identified above, nor did PenFed provide SCS with any historic credit reporting information. See **Exhibit B** at ¶23; Doc. #19-2 at ¶¶9-10.

28. PenFed never notified SCS of Wood's dispute because PenFed considered it to be resolved. See **Exhibit B** at ¶24; Doc. #19-2 at ¶9; Doc. #69 at ¶33.

29. After purchasing the debt, SCS credit reported the Debt but did not initially communicate that the Debt was disputed because SCS did not know that the Debt was disputed until SCS received notice of this lawsuit. See Doc. #19-2 at ¶¶11-12.

30. Since July 2018, SCS has purchased over 14,000 accounts from PenFed with similar terms to the Purchase Agreement; this lawsuit is the first known instance in which SCS purchased an account from PenFed which the accountholder contends is subject to a dispute. See Doc. #19-2 at ¶13; **Exhibit E** at ¶13.

31. SCS relies on the contractual warranties provided by PenFed to conduct its business; more specifically, given the contractual warranties by PenFed to exclude unresolved disputes as well as SCS' history with PenFed, SCS did not specifically inquire of PenFed, nor conduct an independent investigation into, whether the Debt was disputed prior to credit reporting the Debt. See **Exhibit D** at 20:14-21:15 ("there was at no time any reason for us to go back and ask" given terms of contract and history), 23:22-24:21 ("we rely on our Purchase and Sale Agreement, sir, to conduct our business."), 51:8-17 ("Security Credit Services is going to rely on the Purchase and Sale Agreement which already states there's not going to be disputed accounts in the sale file."), 58:12-20 ("[T]hey are a well-run business where they have a history of not selling ineligible accounts, and we have an

6

agreement and in writing that they take commercially reasonable efforts to exclude any accounts . . . that they shouldn't sell."); **Exhibit E** at ¶19.

32. In addition to relying on the contractual representations of PenFed, SCS also relies upon consumers, such as Wood, to advise SCS if an account is disputed. *See* **Exhibit E** at ¶20.

33. Despite SCS credit reporting the Debt since September 2018, Wood never once advised SCS that the Debt was disputed prior to filing this lawsuit. *See* **Exhibit A** at 47:14-16; **Exhibit E** at ¶21.

34. Had Wood advised SCS that the Account was disputed, SCS would have timely notified the national credit reporting agencies of the dispute, consistent with its policies and procedures. *See* **Exhibit E** at ¶22.

35. Specifically, at all relevant times since SCS purchased the Debt, it has been SCS' policy and procedure that when a consumer or a consumer's representative disputes a debt orally or in writing the account must be restricted upon receipt of the dispute with a compliance condition code of "XB" in SCS' Ontario Systems Artiva collection system ("Artiva"). *See* **Exhibit E** at ¶23.

36. Per CDIA guidelines, which guidelines are followed by SCS, compliance condition code "XB" is the code to be used when a consumer disputes a debt pursuant to the Fair Debt Collection Practices Act ("FDCPA"). *See* **Exhibit E** at ¶¶9-12; *id.* at Exhibit 2.

37. To carry out the policy referenced in Paragraph 35 above, SCS' credit reporting staff is trained (which training is carried out at least annually) to perform the following steps: (1) access the consumer's account in Artiva; (2) select "perform action[;]" (3) type "EOSCAR" in the action code field; and (4) select "set EOSCAR dispute[.]" *See* **Exhibit E** at ¶24.

7

38. Completion of the last step ensures that all future credit reporting for the account will automatically include the "XB" compliance condition code. *See* **Exhibit E** at ¶24.

39. The aforementioned procedure was followed on April 21, 2020 after SCS became aware of the Litigation; and the Debt was first reported as disputed with the "XB" compliance condition code no later than May 1, 2020 as a result. *See* **Exhibit E** at ¶¶25-27; **Exhibit D** at 76:2-78:17.

40. The "XB" compliance condition code continued to be reported by SCS for the Debt until January 2021, at which time SCS requested deletion of the tradeline for the Debt because it reached the credit reporting date of obsolescence. *See* **Exhibit E** at ¶28, Exhibit 1; **Exhibit D** at 78:3-5.

41. On or about October 2, 2018, SCS placed the Debt for collection with Glass Mountain Capital, LLC ("Glass Mountain"). *See* **Exhibit E** at ¶30.

42. On October 8, 2018, Glass Mountain returned the Account to SCS with a "LITIGIOUS" code. *See* **Exhibit E** at ¶31.

43. The "LITIGIOUS" code refers to a public database search that identifies if consumers have previously filed lawsuits and are therefore higher risk or litigious. *See* **Exhibit E** at ¶32.

44. The "LITIGIOUS" code does not have any bearing on, nor provide notice as to, whether an account is the subject of a dispute; rather it merely notifies SCS that a consumer has filed one or more lawsuits in the past. *See* **Exhibit E** at ¶33.

45. The actual damages sought by Wood in this case are comprised of what he paid Credit Law Center to help him dispute as well as damages "for how [SCS'] reporting made [him] feel." *See* **Exhibit A** at 51:21-52:3.

8

46. Wood does not know how much he paid Credit Law Center to send the April 2017 letter and does not possess any documents that would show how much he paid. *See* **Exhibit A** at 52:16-53:2.

47. Per Wood, SCS' reporting made him "feel angry and frustrated" for a few days after he pulled his credit report and "periodically" thereafter causing him anxiety and difficulty sleeping but he cannot identify the specific dates of such manifestations. *See* **Exhibit A** at 55:6-57:3, 72:13-23; **Exhibit C** at Interrogatory No. 16 (claiming suffered "garden variety emotional distress" and failing to identify specific dates of claimed distress).

48. Wood never sought medical or professional treatment for his claimed distress and has not identified any witnesses who can corroborate his claimed distress. *See* **Exhibit C** at Interrogatory Nos. 17 and 18.

49. Wood also claims to have received a higher interest rate on a car loan via Capital One as a result of SCS' tradeline; however, nothing about the loan detail report produced by Wood suggests that Wood would have obtained a lower interest rate but for SCS' tradeline and the loan was applied for more than one year prior to bringing this lawsuit, regardless. *See* **Exhibit A** at 57:22-59:22, 60:22-61:4; Exhibit D to Wood Deposition Trans., attached hereto as **Exhibit F** ("open date March 23, 2019"); **Exhibit C** at Interrogatory No. 20; Doc. #1 (Original Complaint) (filed March 30, 2020).

50. Wood is an experienced consumer attorney, having filed thousands of FDCPA cases himself. *See* **Exhibit A** at 62:8-15; **Exhibit C** at Request to Admit No. 7.

51. At all relevant times, Wood knew how to dispute the Debt with SCS but chose not to. *See* **Exhibit A** at 47:14-16; **Exhibit C** at Request to Admit No. 11.

52. Wood does not possess any documentation to support his allegation that his credit score

was "materially lowered" as a result of SCS' reporting. **Exhibit A** at 48:12-15 (Wood does not possess any documents reflecting credit score over the past seven years), 48:24-6 (Wood does not possess any documentation to support allegation that SCS "materially lowered [his] credit score by failing to communicate [his] dispute"); Doc. #69 at ¶68.

        Respectfully submitted,

        **SECURITY CREDIT SERVICES, LLC**

        */s/ Katherine M. Saldanha Olson*
        Katherine M. Saldanha Olson
        Messer Strickler Burnette, Ltd.
        142 W. Station St.
        Barrington, IL 60010
        (312) 334-3444 (direct)
        (312) 334-3473 (fax)
        kolson@messerstrickler.com

        ***Attorney for Defendant***

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of September 2022, a true and accurate copy of the foregoing was filed with the Clerk of Court using the ECF system which will send notification of such filing to the attorneys of record.

>*/s/ Katherine M. Saldanha Olson*
>Katherine M. Saldanha Olson
>Messer Strickler Burnette, Ltd.
>142 W. Station St.
>Barrington, IL 60010
>(312) 334-3444 (direct)
>(312) 334-3473 (fax)
>kolson@messerstrickler.com
>
>***Attorney for Defendant***